**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**ANGELA D. MOSES,**

      **Plaintiff,**

v.                                            **Case No.: 3:10-cv-1255**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

## <u>MEMORANDUM OPINION</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 5 and 6).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

1

## I.     Procedural History

Plaintiff, Angela Moses (hereinafter "Claimant"), filed an application for SSI and DIB on December 13, 2006 (Tr. at 135–139) alleging a disability onset date of December 31, 2004 (Tr. at 135) due to arthritis, back injury, severe headaches, and Irritable Bowel Syndrome (IBS). (Tr. at 64). The Social Security Administration (hereinafter "SSA") denied Claimant's application by undated notice. (Tr. at 64, 69). Claimant subsequently filed a request for reconsideration on June 12, 2007. (Tr. at 74–75). The SSA denied Claimant's request for reconsideration on September 26, 2007. (Tr. at 76–81). Claimant then filed a request for a hearing in front of an Administrative Law Judge (hereinafter "ALJ") on November 6, 2007. (Tr. at 82–83). The initial hearing was held on January 26, 2009; after Claimant requested more time to obtain counsel, the Honorable Rosanne M. Dummer, ALJ, rescheduled Claimant's hearing for April 13, 2009. (Tr. at 25–59). By written decision dated August 6, 2006, the ALJ denied Claimant's SSI and DIB claims. (Tr. at 11–24). The ALJ's decision became the final decision of the Commissioner on August 26, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at  1–5). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 9–12). Consequently, the matter is ripe for resolution.

## II.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th

2

Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the

Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1),

416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through June 30, 2009. (Tr. at 16, Finding No 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since December 31, 2004, the time of the alleged onset date. (*Id.*, Finding No. 2). The ALJ acknowledged the Claimant had briefly worked after the alleged onset date working as a janitor, caregiver, food preparer, and an assembler. (*Id.*). However, the ALJ noted that Claimant had very little taxable income during this time, which did not reflect substantial gainful activity. (*Id.*). Turning to the second step of the evaluation, the

ALJ determined that Claimant had the following severe impairments: cervical and lumbar strain with bilateral radicular symptoms and right shoulder strain. (Tr. at 17, Finding No. 3). The ALJ further concluded that Claimant's sinusitis, gastro-esophageal reflux disease, constipation, migraine headaches, history of upper respiratory infection, and depression were not severe. (*Id.*). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments detailed in the Listing. (Tr. at 18, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had the residual functional capacity to lift or carry 50 pounds occasionally and 25 pounds frequently; stand or walk for six hours out of an eight-hour workday; or sit for six hour out of an eight-hour workday. (Tr. at 18–19, Finding No. 5). The ALJ described Claimant's non-exertional limitations as follows:

> [Claimant] can only occasionally climb ladders, ropes or scaffolds but frequently climb ramps and stairs, balance, kneel, stoop and crawl. She must avoid concentrated exposure to temperature extremes (heat/cold). She should avoid even moderate exposure to hazards of work involving machinery and heights. The Claimant has best corrected visual acuity of 20/70 bilaterally, resulting in limitation for far acuity field of vision.

(*Id.*).

The ALJ then analyzed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 22–24, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) she was born in 1979, and at age 25, was defined as a younger individual age 17–49 on the date the application was filed (20 CFR 416.963); (3) she had a high school education and could communicate in English; and (4) transferability of job skills was not an issue

because Claimant's past relevant work was unskilled. (Tr. at 22–24, Finding Nos. 6–9). Using the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 as a framework and considering the opinion of a vocational expert, the ALJ found that Claimant could make a successful adjustment to employment positions that existed in significant numbers in the national economy, such as a medium level production assembler, production packer, and stock clerk. (Tr. at 23, Finding No. 10). At the light exertional level of jobs, the ALJ found that Claimant could work as a office helper, night guard, and product weigher. (*Id.*). At the sedentary level, the ALJ found that Claimant could work as a production machine tender, product sorter, and production helper. (*Id.*) Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 24, Finding No. 11).

### III.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence

7

exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775.  A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

## IV.   <u>Claimant's Background</u>

Claimant was 25 years old at the time of the alleged disability onset date and 29 years old at the time of her administrative hearing. (Tr. at 22). Claimant had previous experience working as an assembler, food preparation worker, janitor, and caregiver. (*Id.*). Claimant had a high school education and was proficient in English. (*Id.*).

## V.   <u>Relevant Evidence</u>

The undersigned has reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute.

### A.   **Treatment Records**

On June 26, 2003, Claimant first sought treatment for back pain at Westmoreland Chiropractic Center following a work injury at Wendy's Restaurant. (Tr. at 262–66, 393–98). According to Claimant, she injured her back lifting heavy

buckets of ice. In a patient questionnaire, Claimant indicated that she suffered from severe pain that prevented her from: lifting heavy weights, walking more than half a mile, sitting more than half an hour, and standing longer than ten minutes. (Tr. at 264–65). Further, Claimant stated that her pain was gradually worsening and restricted her social life to her home and prevented her from traveling. (Tr. at 265). Elizabeth Hay Martin, D.C., completed a neurological-orthopedic examination of Claimant. (Tr. at 262–63). Dr. Martin found that Claimant had normal cervical, thoracic, and lumbar curvature of the spine with spondylolistesis[1] of the L5 on the sacrum. (Tr. at 263). Dr. Martin concluded that Claimant had a restricted lumbar and cervical flexion and would require follow-up treatment. (Tr. at 267). Ultimately, Dr. Martin signed four disability certificates certifying that Claimant would be totally incapacitated from June 26th to July 1st, 2003; July 1st to July 14th, 2003; July 23rd to August 4th, 2003; and August 4th to August 18th, 2003. (Tr. at 407–10).[2]

On June 30, 2003, an x-ray of Claimant's lumbosacral spine was taken at St. Mary's Medical Center (hereinafter "St. Mary's"). (Tr. at 412). The x-ray was interpreted to show a grade one spondylolisthesis of the fifth lumbar vertebra. (*Id.*). Otherwise, Claimant's lumbar spine appeared relatively stable. (*Id.*).

On August 4, 2003, Claimant returned to Westmoreland Chiropractic for continued treatment of her back pain. (Tr. at 268–71). In an updated patient

---

[1] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper position onto the bone below it. US National Library of Medicine, A.D.A.M. Medical Encyclopedia (2010).

[2] On August 7, 2003, Dr. Martin modified her last disability certificate and documented that Claimant could return to regular work effective August 11, 2003. (Tr. at 411).

questionnaire, Claimant's responded consistently with her June 26, 2003 answers, except that she noted she could now walk up to one mile. (Tr. at 268–70). Claimant further commented that her back pain was getting better. (*Id.*). Dr. Martin recorded that Claimant was suffering from moderate lower back pain; that Claimant's current status was "fair to good;" and that Claimant's long-term prognosis was "good." (Tr. at 271).

Claimant returned to Westmoreland Chiropractic for a follow up appointment on October 8, 2003 and completed a third patient questionnaire. (Tr. at 272–74). In this document, Claimant indicated that she continued to experience lower back pain, but her pain did not restrict her from walking any distance; had a limited effect on her social life; and had a limited effect on her ability to travel. (Tr. at 272–74). Overall, Claimant noted that her back pain was getting better. (*Id.*). Two days later, Dr. Martin completed a progress report regarding Claimant's intermittent lower back pain. (Tr. at 275). She indicated that Claimant had some restrictions of motion and her pain increased when lifting heavy objects. However, Dr. Martin's evaluation of Claimant's current status was "fair to good" and her long-term prognosis was "good." (*Id.*).

Claimant next received medical treatment on August 24, 2004 after being admitted to the emergency room at St. Mary's Medical Center for stomach and intestinal pain. (Tr. at 280–81). Steve Nathenson, M.D., noted that Claimant had not had a bowel movement for four days and reported nausea, vomiting, fevers, and chills. (*Id.*). Dr. Nathenson diagnosed Claimant with constipation and Irritable Bowel Syndrome (IBS). (*Id.*). An x-ray of Claimant's abdomen was unremarkable; all findings were within normal limits. (Tr. at 282–83).

On May 13, 2007, Claimant began treatment at Ebenezer Medical Outreach, Inc. (hereinafter "Ebenezer"). At her initial visit, Claimant completed a new patient history form. (Tr. at 340–41). Claimant reported that she suffered from IBS, depression, anxiety, headaches, and heartburn. (Tr. at 340). Claimant also noted that she regularly exercised and used tobacco products. (Tr. at 341). On June 6, 2007, Claimant returned to Ebenezer complaining of GERD, IBS, migraines, and chronic back pain. (Tr. at 335–339). A Certified Family Nurse Practitioner (CFNP) examined Claimant and prescribed Nexium,[3] Allegra,[4] Maxalt,[5] and Phenergan[6] to be taken on a regular basis. (Tr. at 335). The CFNP also recommended that Claimant begin taking Metamucil, increase her daily fluid intake, quit smoking, and begin mental health counseling. (*Id.*).

Claimant returned to Ebenezer on July 26, 2007 for an appointment regarding her GERD and IBS. (Tr. at 370). Claimant complained that she was not able to have a bowel movement, but that her GERD had improved with medication. (*Id.*). The examining physician at Ebenezer wrote Claimant a prescription for Dulcolax[7] and ordered a barium enema study. (*Id.*). Three days later, Claimant presented to the emergency room of St. Mary's Medical Center with complaints of abdominal pain, constipation, and vomiting. (Tr. at 445–48). Claimant reported

---

[3] Nexium is used to treat gastroesophageal reflux disease. www.nlm.nih.gov.

[4] Allegra is used to relieve the allergy symptoms of seasonal allergic rhinitis. www.nlm.nih.gov.

[5] Maxalt is used to treat the symptoms of migraine headaches. www.nlm.nih.gov.

[6] Phenergan is used to relieve the symptoms of allergic reactions such as allergic rhinitis. www.nlm.nih.gov.

[7] Dulcolax is a laxative used on a short-term basis to treat constipation.

experiencing the symptoms for a period of five days. She told the intake nurse that she was given a prescription for Dulcolax by her family physician, but had not used it. The emergency room physician diagnosed Claimant with abdominal pain, constipation, and a urinary tract infection. She was prescribed an antibiotic and suppository and was directed to follow up at Ebenezer. (Tr. at 447). On August 7, 2007, the barium enema study was performed at St. Mary's. The results of the study were negative, showing no mass, polyp, constricting lesions, or diverticula. (Tr. at 375).

On September 19, 2007, Claimant presented for a follow up appointment at Ebenezer where she complained of depression and anxiety. (Tr. at 380). Claimant stated that she was seeing a psychologist, David Clay, who recommended that she begin treatment on antidepressants.[8] (*Id.*). Claimant advised that her anxiety was more of a problem than her depression. The examining physician prescribed Lexapro and directed Claimant to continue seeing Mr. Clay. (*Id.*). On November 1, 2007, Claimant returned to Ebenezer for treatment of her GERD and IBS symptoms. The examining physician noted that Claimant continued to complain of migraines but that her GERD and IBS symptoms were controlled by Claimant's use of Nexium and Miralax. (Tr. at 369). He recommended that Claimant continued to use Maxalt for her migraine headaches. (*Id.*). Several months later, on February 26, 2008, Claimant returned to Ebenezer for a routine follow up appointment. (Tr. at 378). Claimant stated that she was still smoking because it helped to calm her nerves but that she was trying to quit. (*Id.*). She claimed said that she was doing well

---

[8] Mr. Clay's treatment records were not included in Claimant's medical records submitted as evidence.

and that therapy with Mr. Clay regarding her depression and anxiety was helpful. (*Id.*).

On April 18, 2008, Claimant was involved in a motor vehicle accident. Claimant received treatment for rib, leg, and back pain in the emergency room at King's Daughters' Medical Center. (Tr. at 415–24). A chest x-ray of Claimant revealed no abnormalities and no consolidation or pleural effusion. (Tr. at 425). Claimant was discharged in stable condition. (Tr. at 424). A month after her trip to the emergency room, on May 15, 2008, Claimant returned to the Ebenezer Clinic for treatment of her GERD and IBS symptoms. (Tr. at 368). The examining physician noted that Claimant's GERD and IBS were well controlled and stable although Claimant rarely used her constipation medicine and continued to smoke heavily. (*Id.*).

In June 2008, Claimant returned to St. Mary's emergency room complaining of sinus pain, muscle aches, a sore throat, and headaches. (Tr. at 438–40). The treating physician diagnosed Claimant with acute sinusitis. (*Id.*).

On June 26, 2008, Claimant was treated at Cabell Huntington Hospital's emergency room for injuries sustained after tripping and falling down a flight of stairs. (Tr. at 481). Claimant complained of pain concentrated in her abdomen and in her lower back. (Tr. at 481, 483). On physical examination, the emergency room physician documented the absence of any abnormal findings. (Tr. at 481). Claimant was subsequently discharged in stable condition. (Tr. at 482).

One October 24, 2008, Claimant was treated at St. Mary's for complaints of nausea, vomiting, headaches, dizziness, and constipation. (Tr. at 430). Claimant was 30 weeks pregnant at the time of her visit to St. Mary's. (*Id.*). The examining

physician diagnosed Claimant as suffering from a UTI and recommended Tylenol for treatment of Claimant's symptoms. (Tr. at 431). On December 8, 2008, Claimant delivered a healthy premature infant.  (Tr. at 465).

### B.    Workers Compensation and Agency Assessments

On August 30, 2004, Claimant was examined by Bruce A. Guberman, M.D., of Tri-State Occupational Medicine, Inc., at the request of Workers Compensation.[9] (Tr. at 285–96). Dr. Guberman documented that Claimant had injured her back lifting boxes at work on June 22, 2003. She received monthly chiropractic treatment from Dr. Martin[10] and that treatment generally improved her symptoms for two weeks at a time. Claimant did not take any medication for her pain and had never had an MRI, CT scan, or myelogram of her back. (Tr. at 285). Claimant described her back pain as ranging from sharp to dull and spreading through her hips, legs, and feet. (*Id.*). Dr. Guberman wrote:

> [Claimant's] pain is made worse by prolonged and frequent bending, stooping and lifting and prolonged sitting, standing and walking. The pain is made worse by riding in a car, but not by coughing or sneezing. The claimant does not use a back brace, heating pad or a bed board, but often sleeps with a pillow under her lower back.

(*Id.*).  In addition, Claimant reported being in a car accident in 1997 that resulted in intermittent neck pain and being struck on the head at work in December 2003, which caused her still to suffer from headaches. She denied any other significant work-related injury, but complained of abdominal pain, light headedness, and a two month history of bilateral shoulder pain unrelated to trauma or injury. (Tr. at 286).

---

[9] Claimant filed a claim for Workers Compensation benefits as a result of her injury at Wendy's.

[10] No further treatment records for Dr. Martin were included in Claimant's evidentiary submission after her visit on October 8, 2003.

Upon completing a thorough physical exam, Dr. Guberman concluded that Claimant's spine exhibited a mild range of motion abnormalities in the lumbar spine without evidence of nerve root compression or motor or sensory abnormalities. Her shoulders, elbows, wrists, hands, legs, and knees were normal. (Tr. at 287–88). Ultimately, Dr. Guberman diagnosed Claimant as suffering from acute and chronic lumbosacral strain, post-traumatic, and rated her with a 7% impairment of the whole person due to her lumbar injury. (Tr. at 289–90).

At the request of Workers Compensation, John O. Mullen, M.D., an orthopedist at Scott Orthopedic Center, completed an independent medical evaluation of Claimant on September 21, 2004. (Tr. at 298–302). Dr. Mullen reviewed Claimant's medical records and conducted a physical examination with specific reference to an injury to Claimant's left index finger that she allegedly suffered at work on December 4, 2002. Claimant reported that she was working as an assembler at ADECO and cut her left index finger with scissors while assembling a window. (Tr. at 300). After cutting her left index finger, Claimant went to St. Mary's Emergency Room where she got a tetanus shot and pain medication. (*Id.*). Claimant did not return to work until several days later. (*Id.*). Dr. Mullen noted that Claimant complained of an occasional ache in the injured finger but that she could hold and use a glass, pencil, and different utensils. (*Id.*). Dr. Mullen noted that he found no restrictions in Claimant's ability to do any occupation for which she was appropriately trained by experience or education and confirmed that Claimant had no strength or sensory deficit and had no loss of range of motion. (Tr. at 302).

Approximately two and one half years later, on March 20, 2007,[11] Claimant was examined by Kip Beard, MD, at Tri-State Occupational Medicine, at the request of the West Virginia Social Security Disability Determination Service ("DDS"). (Tr. at 305–09). Dr. Beard noted that Claimant's chief complaints were back pain, arthritis, and headaches. (Tr. at 305). Claimant informed Dr. Beard that she had suffered a neck injury in car accident when she was 14 years old and injured her back in 2003. (*Id.*). According to Claimant, she was told that she had broken a lower part of her spine in addition to having arthritis in her lower back and neck. (*Id.*). Further, Claimant complained of problems with her right shoulder dating to 2003-2004 and continued pain in her shoulder, knee, and ankle. (Tr. at 305–06). With respect to headaches, Claimant stated that they produced a throbbing pain in her temple region that affected her vision and produced dizziness.  She had experienced frequent headaches for two-and-a-half to three years, and they occurred almost every day, lasting the entire day. (Tr. at 306). She indicated that she had sought treatment for the headaches at Cabell Huntington Hospital, but was not given prescribed any head CT scans or MRI studies. She treated the headaches with Tylenol, although this medication did not relieve her pain.

On examination, Dr. Beard found that Claimant's neck, chest, cardiovascular system, abdomen, arms, hands, knees, ankles, and feet were all normal. (Tr. at 307–08). Regarding Claimant's lumbosacral spine and hips, Dr. Beard concluded that Claimant's spine revealed normal curvature, but that Claimant complained of mild pain and muscle tenderness. (Tr. at 308). Dr. Beard further noted that Claimant's

---

[11] No records reflecting medical treatment or evaluation were included in the record for the time period between September 21, 2004 and March 20, 2007.

range of motion revealed no limitations. (*Id.*). Ultimately, Dr. Beard diagnosed Claimant as suffering from chronic cervical strain, chronic lumbosacral strain with bilateral radicular symptoms, right shoulder strain, and arthralgias.[12] An x-ray of Claimant's lumbar spine revealed a spondylolysis[13] at the L5 level and a grade II spondylolisthesis that slipped anteriorly in relation to the S1 level. (*Id.*).

On March 30, 2007, Thomas Louderman, D.O., completed a RFC assessment and found that Claimant could occasionally lift 50 pounds; frequently lift 25 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 313). Dr. Louderman found no postural limitations except that Claimant could only occasionally climb ladders, rope, or scaffolding. (Tr. at 314). Dr. Louderman noted that Claimant had visual limitations with regard to far acuity and field of vision. (Tr. at 315). Further, Claimant was to avoid concentrated exposure to extreme cold or heat and to avoid even moderate exposure to hazards such as machinery or heights. (Tr. at 316). Dr. Louderman indicated that Claimant admitted to performing personal care, including: household chores, driving, and running errands. (Tr. at 319). Dr. Louderman found Claimant's statements that she could not lift more than three pounds or walk more than a block to be "partially credible" since the medical evidence did not substantiate these allegations to the degree alleged. (*Id.*).

On April 4, 2007, Karen Sarpolis, M.D., completed a Medical Consultant's Review of Dr. Louderman's RFC assessment. (Tr. at 320). Dr. Sarpolis agreed with

---

[12] Arthralgia is pain in a joint or joints. Mosby's Medical Dictionary, 8th edition (2009).

[13] Spondylolysis is the breaking down of a vertebra. Dorland's Medical Dictionary (2007).

Dr. Louderman's assessment regarding Claimant's exertional, postural, manipulative, visual, communicative, and environmental limitations. (*Id.*). Dr. Sarpolis also agreed that Dr. Louderman had properly discussed all of Claimant's symptoms and Claimant's relevant treating source statements. (*Id.*).

On September 19, 2007, A. Rafael Gomez, M.D., a state agency consultant, reviewed the medical evidence of record and completed an updated RFC assessment of Claimant. (Tr. at 345). Dr. Gomez found that Claimant could occasionally lift 50 pounds; frequently lift 25 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 346). Like Dr. Louderman, Dr. Gomez found no postural limitations except that Claimant could only occasionally climb ladders, rope, or scaffolding. (Tr. at 347). Dr. Gomez found that Claimant should avoid concentrated exposure to extreme heat, extreme cold, and hazards, such as machinery or heights. (Tr. at 349). Further, Dr. Gomez noted that Claimant drove, did laundry, performed household chores and personal upkeep, cooked simple meals, visited with family, watched television, and completed errands. (Tr. at 352). Dr. Gomez concluded that Claimant was only partially credible when describing the persistence and intensity of her symptoms and, even in light of the recent diagnoses of GERD, sinusitis, IBS and migraine headaches, she was capable of performing medium level exertional work. (Tr. at 350).

## VI.   **Claimant's Challenges to the Commissioner's Decision**

Claimant contends that the Commissioner's decision is not supported by substantial evidence because: (1) Claimant's physical and mental impairments in combination meet or are equal to a listed impairment and (2) Claimant's subjective

complaints of pain are entitled to full credibility and establish her disability. (Pl.'s Br. at 5–8). In response, the Commissioner argues that substantial evidence supports the ALJ's decision that Claimant is not disabled because: (1) the medical records do not support the severity of musculoskeletal symptoms necessary to meet or equal a listed impairment and (2) the ALJ reasonably determined Claimant's credibility to be "poor" in light of the lack of medical evidence supporting Claimant's allegations. (Def.'s Br. at 12–16).

## VII.  Analysis

Having thoroughly considered the evidence and the arguments of counsel, the Court rejects Claimant's contentions as lacking merit. Additionally, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

### A.    Impairments in Combination

Claimant first argues that her impairments when considered in combination "obviously" equal a listed impairment, although she does not identify to which listed impairment she refers.  A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to

19

meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). Inasmuch as the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530.

To establish medical equivalency, a claimant must present evidence that her impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 520; *See also* 20 C.F.R. § 404.1526. In Title 20 C.F.R. § 404.1526, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. § 404.1526(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment. § 404.1526(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. § 404.1526(b)(3).

As the Supreme Court explained in *Sullivan*, "[f]or a claimant to qualify for

benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment . . . A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.[14] Ultimately, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify a determination of equivalence.  *Id.* at 532 (citing SSR 83-19).[15]

In this case, Claimant's severe impairments include cervical and lumbar strain with bilateral radicular symptoms and right shoulder strain. (Tr. at 17). Accordingly, the listed impairments relating to the musculoskeletal system are most relevant to Claimant's constellation of conditions. Of those impairments, Listing 1.04, involving disorders of the spine, is the only listing applicable to Claimant's particular medical findings and symptoms. In order to satisfy the criteria of Listing 1.04, Claimant must demonstrate a disorder of the spine, which results in

_____

[14] The Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems."  *Id.*  At the time of the *Sullivan* decision, Down's syndrome was not an impairment included in the Listing.  Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and  demonstrate fulfillment of the criteria associated with that listing.

[15] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses medical equivalence in the context of SSI benefits for children.  However, the explanation of medical equivalency contained in *Sullivan v. Zembly* remains relevant to this case.

compromise of a nerve root and shows evidence of nerve root compression, spinal arachnoiditits, or lumbar spinal stenosis. The ALJ emphasized that the medical records reflected only complaints of mild back pain with muscular tenderness. (Tr. at 18). Further, the ALJ noted that all of Claimant's neurological examinations were within normal limits. (*Id.*) The ALJ explicitly compared Claimant's clinical findings to Listing 1.04 and concluded that the medical findings, signs, and laboratory data did not meet the criteria of the listing specifically because there was no evidence of the requisite neurological deficits necessary to meet or equal a Listing under Section 1.04. (*Id.*). The ALJ further concluded that Claimant's sinusitis, gastro-esophageal reflux disease, constipation, migraine headaches, history of upper respiratory infection, and depression were not severe (*Id.*) and certainly did not result in neurological impairment that affected Claimant's spine. The ALJ's conclusions are supported by substantial evidence in the medical record. Numerous physicians had evaluated Claimant's physical impairments as a result of her multiple trips to the emergency room and her worker's compensation and disability claims. No physician ever prescribed medication, physical therapy, a TENS unit, braces or other assistive devices for Claimant's back pain. No physician ever recommended that Claimant have injections or surgery on her back. No physician ever diagnosed Claimant with a neurological disorder of the spine or its equivalent. The medical record indicates that multiple physicians diagnosed Claimant as suffering from spondylolistesis and spondylolysis that caused only mild pain in her lower back. Therefore, as there is no medical evidence of a neurological disorder of the spine or its equivalent among any combination of Claimant's impairments, Claimant has not satisfied Listing 1.04.

If Claimant's argument is not that her impairments are medically equivalent

to a listed impairment, but that the overall functional consequence of her combined impairments meets the statutory definition of disability, the analysis shifts from the Listing to the ALJ's RFC findings and the remaining steps of the sequential evaluation.  As the Fourth Circuit Court of Appeals stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity."  *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

An examination of the ALJ's RFC assessment confirms that she took into account the exertional and non-exertional limitations that resulted from Claimant's

medically determinable impairments. The ALJ restricted Claimant to medium exertional work based upon her musculoskeletal conditions and further limited her climbing, exposure to extreme temperatures, and hazards in working with machinery in light of her other medical conditions. (Tr. at 19). The ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence. (Tr. at 20–22). Moreover, at the administrative hearing, the ALJ presented the vocational expert with a hypothetical question that required the expert to take into account Claimant's impairments in combination. She asked the expert to assume that Claimant had the exertional limitations identified in her RFC assessments, as well as additional postural and environmental limitations. Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform certain jobs that existed in significant numbers in the economy. (Tr. at 53–54).

The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude her from engaging in substantial gainful activity is amply supported by the medical record. Other than the weeks immediately following Claimant's back injury in 2003, no physician or therapist found that Claimant's impairments separately or in combination prevented her from engaging in substantial gainful activity. Three separate physicians examined Claimant as part of her Worker's Compensation and disability claims and found no limitations on Claimant's ability to engage in substantial gainful activity. Similarly, in both RFC assessments, the reviewing physicians found that Claimant could engage in "medium" work with minimal postural and environmental limitations. In light of this substantial evidence, the undersigned is satisfied that the ALJ adequately

24

considered and accounted for the overall functional impact of Claimant's combined impairments.

### B.    Challenges to Credibility Assessment

Claimant contends that her subjective complaints of pain are sufficient to establish that she is disabled and that she is "entitled to full credibility because her exertional and non-exertional impairments are disabling in nature." (Pl.'s Br. at 6). In support of these contentions, Claimant asserts that her testimony and the medical records are "mutually supportive" and therefore satisfy the requirements of 42 U.S.C. § 423(d)(5)(A). (*Id.*). Relying upon the Fourth Circuit Court of Appeals' opinion in *Hines v. Barnhart,* 453 F.3d 559 (4th Cir. 2006), Claimant emphasizes that "a finding of disability can be based exclusively on subjective evidence of pain if a claimant's impairments can reasonably be expect to produce same." (Pl. Br. at 6).

While Claimant correctly cites the case law, her challenge fails for two reasons. First, the ALJ properly employed the two-step process set forth in SSR 96-7p to determine the severity of the subjective symptoms alleged by Claimant. Second, the ALJ explained at length why she did not assign full credibility to Claimant's statements regarding the intensity, persistence, and severity of her symptoms. (Tr. at 29–31).

In *Hines v. Barnhart,* the Fourth Circuit reiterated its long-held standard governing the role of subjective evidence in proving the intensity, persistence, and disabling effects of pain, stating "[b]ecause pain is not readily susceptible of objective proof, however, *the absence of objective medical evidence of the intensity, degree or functional effect of pain is not determinative." Hines*, 453 U.S. at 564–565 (emphasis in original).  Hence, once an underlying medical condition capable of

eliciting pain is established by objective medical evidence, disabling pain can be proven by subjective evidence alone. Nonetheless, this standard does not require the ALJ to ignore objective evidence that implies the intensity or degree of pain. To the contrary; to the extent that objective evidence exists, the ALJ should consider it. Moreover, in determining the weight to give to subjective descriptions of pain, the ALJ must consider the credibility of the claimant.

Social Security Ruling 96-7p was promulgated to further elucidate the process by which an ALJ must evaluate symptoms, including pain, pursuant to 20 C.F.R. § 416.929, in order to determine their limiting effects on a claimant.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities.  *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ should consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this evaluation, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective

complaints; claimant's medical history, medical signs, and laboratory findings;[16] any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);[17] and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[18] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). In *Hines*, the Fourth Circuit Court of Appeals stated,

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In

---

[16] *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1).

[17] *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2).

[18] *See* 20 C.F.R. §§ 416.929(c)(3) & 404.1529(c)(3).

reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989–990 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Rulings. 20 C.F.R. §§ 404.1529 and 416.929; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). The ALJ carefully considered Claimant's subjective complaints of pain *and* the objective medical record in reaching a conclusion regarding Claimant's credibility. Significant evidence existed in the record that Claimant's complaints of disabling pain and other symptoms did not correlate with the objective medical evidence or with her own description of her daily activities.

At the outset of the two-step process, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to produce the pain and symptoms described by her. (Tr. at 21). However, the ALJ deemed Claimant's credibility to be only "poor" in light of her vague testimony. (*Id.*). Further, the ALJ noted that Claimant's testimony was "not supported by the overall evidence of record." (*Id.*). The ALJ recognized that Claimant complained of difficulty with her knee giving out; pain when walking, standing or sitting; back pain that increased over time; limited sensation in her fingers; arthritis; IBS; sinus problems; migraines; and depression and anxiety. (Tr. at 19–21). At the same time,

28

Claimant testified that she did housework and laundry, cooked, ran errands, attended church, and helped take care of her father. (Tr. at 21). She enjoyed a full social life and was busy engaging in daily activities with her family and siblings. Moreover, the ALJ pointed out inconsistencies in Claimant's testimony. Claimant testified that when she worked, she had a good work record. However, the records, including the earnings statements, reviewed by the ALJ demonstrated the contrary. (*Id.*). In addition, Claimant alleges disabling symptoms yet she received limited diagnostic testing and her medical care was generally conservative in nature.

The ALJ analyzed and compared the medical records concerning Claimant's individual impairments with her own testimony. (Tr. at 19–21). In analyzing Claimant's mental health issues, the ALJ found that Claimant had normal persistence, pace, concentration and maintained average social functioning with mild limitations that did not affect her daily life. (Tr. at 17–18). The ALJ emphasized that Claimant's own testimony indicated she was able to adequately perform a range of daily activities. (*Id.*) With regard to Claimant's back injury, the ALJ noted that the Worker's Compensation examiner found in 2003 that Claimant had reached maximum medical improvement and recommended no further treatment. (Tr. at 21). In 2004, Dr. Mullen observed that he saw "no restriction in [Claimant's] ability to do any occupation for which she is appropriately trained by experience or education." (*Id.*) Dr. Beard agreed with Dr. Mullen's assessment of Claimant noting that Claimant had no pain or tenderness of the neck; normal range of motion in the cervical and lumbar spine; and complaints of mild pain in the lower back that were within the normal range. (*Id.*). The ALJ emphasized that objective testing had shown no range of motion deficits or sensory loss and x-rays of Claimant's spine

were found to be unremarkable. (Tr. at 22). Furthermore, the RFCs conducted by state agency doctors concluded that Claimant could occasionally lift 50 pounds; frequently lift 25 pounds; stand or walk six hours in a day; sit for six hours a day; and was unlimited in her ability to push or pull. (Tr. at 21).

Substantial evidence supports the ALJ's credibility determination. Here, Claimant's testimony was "inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain that the claimant alleges she suffers." *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Despite Claimant's complaints that she was unable to work, both state agency physicians that completed RFCs found her to be capable of medium exertional work. Furthermore, both state agency physicians found her to be partially credible because the medical evidence did not substantiate the degree of severity, persistence, and intensity alleged by Claimant. An ALJ is entitled to afford significant weight to the opinion of a state agency non-examining psychologist or physician: agency regulations specifically provide that state agency medical consultants "are highly qualified physicians ... who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). The findings of the two state agency physicians were supported by the three reports of consultative medical examiners. Although Claimant testified that she was unable to work because of her impairments, all three consultative examiners found that Claimant was not restricted in her ability to engage in substantial gainful activity and that she suffered only from mild back pain, within normal limits. Consequently, the ALJ reasonably found Claimant's credibility to be poor to the extent that Claimant's testimony was

contradicted by the objective medical record. *Hines*, 453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Therefore, the undersigned finds that the ALJ's discussion of Claimant's subjective complaints of pain was sufficient and her conclusions were supported by substantial evidence.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**:  October 4, 2011.

Cheryl A.  Eifert
United States Magistrate Judge